Judith **SANDERSON**, Plaintiff,

v.

**INTERNATIONAL FLAVORS AND FRAGRANCES, INC., a New York Corporation, et al., Defendants.**

**No. CV–95–3387–SVW (VAPX)**

United States District Court,
C.D. California.

July 11, 1996.

Michael N. Friedman, Michael N. Friedman Law Offices, Los Angeles, CA, for plaintiff Judith Sanderson.

Stephen A. Kroft, Bryan Thomas Castorina, McDermott Will & Emery, Los Angeles, CA, for defendant International Flavors & Fragrances Inc.

William J. Sayers, Jeffrey B. Margulies, Farah Sohaili Nicol, Haight Brown & Bonesteel, Santa Monica, CA, for defendants Parfums Guy Laroche, Cosmair Inc.

Michael J. Bonesteel, Jeffrey B. Margulies, Caroline S. Craddock, Haight Brown & Bonesteel, Santa Monica, CA, for defendant Calvin Klein Jeanswear Co. Inc.

Robert A. Grantham, Murchison & Cumming, Los Angeles, CA, for defendants Coty Inc., Landcaster Group.

Jeffrey S. Barron, Janet Marie Richardson, Morris Polich & Purdy, Los Angeles, CA, for defendant The Body Shop Inc.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF CAUSATION AND GRANTING DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESSES ON THE ISSUE OF CAUSATION

WILSON, District Judge.

## BACKGROUND

Plaintiff Judith Sanderson filed this action in state court against defendant International Flavors and Fragrances, Inc. ("IFF") for personal injuries stemming from her exposure to various perfumes and colognes ("fragrance products"), seven of which she identified in her complaint: Boss, Drakkar Noir, Stetson, Joop! Homme, Calvin Klein's Obsession, Davidoff's Cool Water, and Freesia ("the seven fragrances"). IFF removed to this Court, and plaintiff added several other defendants whom she had previously sued as Does, all of whom are alleged to be manufacturers or distributors of one or more of the seven fragrances.

IFF filed three separate motions: a motion for summary judgment on the issue of the statute of limitations; a motion for summary judgment on the issue of causation; and a motion for an order excluding plaintiff's expert witnesses on the issue of causation. The other defendants have filed joinders, sometimes with additional argument of their own. The Court held a hearing on these motions on July 1, 1996. In a separate Order, the Court denied defendants' motion for summary judgment based on the statute of limitations. In this Order, the Court addresses defendants' other two motions, and for the reasons expressed herein, grants defendants' motion for summary judgment on the issue of causation.

## DISCUSSION

### I.

### CAUSATION

Plaintiff's complaint pleads two causes of action: negligence and strict liability. Under California law, which supplies the rule of decision in this diversity action, causation is an essential element of both claims. "The general rule is that the burden of proof is on the plaintiff to establish that the injuries she suffered were caused by the conduct of the defendant." *Murphy v. E.R. Squibb & Sons, Inc.*, 40 Cal.3d 672, 221 Cal.Rptr. 447, 453–54, 710 P.2d 247, 253 (1985); *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 163 Cal. Rptr. 132, 136, 607 P.2d 924, 928 (1980). "The law is well-settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case.... A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury." *Jones v. Ortho Pharmaceutical Corp.*, 163 Cal.App.3d 396, 209 Cal.Rptr. 456, 460 (2 Dist.1985) (citations omitted); *Cottle v. Superior Court (Oxnard*

*Shores Co.),* 3 Cal.App. 4th 1367, 5 Cal. Rptr.2d 882, 892 (2 Dist.1992).

■ It should be emphasized that *expert* testimony is required to establish causation, since this case involves scientific issues that are "beyond the experience of laymen." *Id.* 209 Cal.Rptr. at 461 ("in the absence of factual circumstances of probability understandable to a jury there must be some scientific testimony that can be interpreted as an inference of hypothetical probability before we can allow a jury to speculate upon the rights of citizens") (*quoting Parker v. Employers Mut. Liability Ins. Co. of Wisconsin,* 440 S.W.2d 43, 49 (Tex.1969)). Plaintiff therefore cannot withstand summary judgment by relying on her own testimony about her exposures to defendants' products and her alleged injuries or by arguing for an inference of causation from "the totality of the circumstances." *Cottle,* 5 Cal.Rptr.2d at 892 ("In California, causation must be founded upon expert testimony and cannot be inferred from the jury's consideration of the totality of the circumstances unless those circumstances include the requisite testimony on causation.").

Plaintiff has presented declarations from four experts on various aspects of the issue of causation: Nachman Brautbar, M.D., an internist and nephrologist; Gunnar Heuser, M.D., an internist; Richard Perillo, Ph.D., a neuropsychologist; and Jack Thrasher, Ph. D., an anatomist and cell biologist.

■ In order to prove that a defendant's conduct was the cause in fact of her injuries, a plaintiff must establish that such conduct was "a substantial factor in bringing about the injury." *Lineaweaver v. Plant Insulation Co.,* 31 Cal.App. 4th 1409, 37 Cal.Rptr.2d 902, 905 (1 Dist.1995). Thus, in order to hold a defendant liable, plaintiff must prove "a reasonable medical probability based upon competent expert testimony that the defen-

dant's conduct contributed to plaintiff's injury." *Id.* (citation omitted). To withstand summary judgment as to a defendant, then, plaintiff must present evidence from which a rational jury could find such a reasonable medical probability as to that defendant's conduct.

IFF argues that plaintiff cannot survive summary judgment on a normal causation theory, since none of plaintiff's experts could say that there was a reasonable medical probability that either Boss or Drakkar Noir (the only two of the seven fragrances for which IFF manufactures the concentrated fragrance oils) contributed to her injuries. The other defendants make the same argument as to their products. Defendants further argue that plaintiff cannot survive summary judgment on a market-share liability theory or by otherwise shifting the burden of (dis)proving causation to defendants.[1]

Plaintiff makes three arguments in opposition. First, she argues that a jury could in fact find, based on her experts' testimony, that defendants' products were a substantial factor in causing her injuries. The Court disagrees. While a jury could probably find that defendants' products, *as a whole,* were a substantial factor in causing her injuries, plaintiff has no evidence whatever from which a jury could find that *any particular defendant's products* were.

Second, she argues in essence that the Court should adopt a "common-sense," lay interpretation of causation. She contends that because her injuries are of the type caused by defendants' products, she was exposed to same, and there is a temporal connection between such exposures and her experience of symptoms, a jury could find that defendants' products caused her injuries. Whatever the "common-sense" appeal of this argument, it fails because California law clearly requires expert testimony on causa-

1. In their separate motion for an order excluding plaintiff's expert witnesses on the issue of causation, defendants argue that, even if their testimony would create a genuine issue of fact as to causation, plaintiff cannot survive summary judgment because all of their testimony on the issue of causation is inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

This motion is addressed in Part II of this Order, and for the reasons expressed therein, the Court grants such motion. The Court's *Daubert* holding thus constitutes an alternative ground for its grant of summary judgment in addition to its holding that plaintiff's experts' testimony, even if admitted, fails to establish a genuine issue of fact as to causation.

tion in a case like this. In addition, this argument equates *symptoms* with *injuries,* but her experts testify unanimously that they *cannot* say that she was injured each time she experienced a symptom.

Finally, plaintiff argues that, based upon fairness grounds, the Court should shift the burden on causation to defendants. In so arguing, plaintiff does not exactly urge the application of market-share liability under *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, *cert. denied,* 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980), or alternative liability under *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948); rather, she asks the Court to apply "some type of modified market share theory of liability." Based upon its review of the California authorities, the Court concludes that such burden-shifting is limited to cases meeting the criteria of either *Sindell* or *Summers,* and, as plaintiff implicitly recognizes in arguing for a "modified" burden-shifting theory, this case does not fall within either one. Mindful of its role as a federal court sitting in diversity, the Court therefore declines to effect the "modification" which plaintiff advocates.

### A. Traditional, Direct Causation

■ Plaintiff's claimed injuries are sinus inflammation, toxic encelopathy (brain damage), dysosmia (deranged sense of smell), small airways disease (or reactive airways disease), and multiple chemical sensitivity ("MCS").[2] Brautbar Depo. 37/20–39/6; Heuser Depo. 64/23–68/19; 118/4–120/12; Thrasher Depo. 84/2–85/5. Plaintiff contends that her injuries were caused by her acute exposures to formaldehyde in the 1960s,

1970s, and 1980s, and exacerbated by thousands of exposures to fragrance products containing aldehydes between 1993 and the present. Pl.Depo. 374/15–383/25; Brautbar Depo. 46/8–47/20; 65/8–67/9; 69/16–70/9; 155/12–22;.318/5–320/25; Heuser Depo. 70/8–23; Thrasher Depo. 101/11–17; Thrasher Decl. ¶ 13.[3]

Plaintiff alleges that she was exposed to fragrance products on over 16,000 occasions between April 1994 and October 1995. Pl. Depo. 1022/7–1023/5; Feb. 8, 1996 letter from Friedman to Kroft at 3 (Exh. A to Kroft Decl.). (Plaintiff originally testified that she had been exposed to fragrance products over ten times per day, but she corrected her deposition transcript to state that the proper figure was 30, which works out to over 16,000 exposures during that time period.) For 70 percent of those occasions, plaintiff is unable to identify the fragrance product or products to which she was exposed. Pl.Depo. 1019/4–24; 199/20–200/15; 887/9–888/1; First Amended Complaint ¶ 20; Pl.Resp. to Interr. No. 18 & 20. Plaintiff alleges that she was exposed to Boss on two occasions and to Drakkar Noir on 20–30 occasions. Pl.Depo. 238/16–239/9; 964/2–10.

As noted above, plaintiff's experts testify that her injuries were caused by aldehydes in fragrance products. *But none of her experts was able to express an opinion that her injuries were caused by any particular fragrance product or any particular exposure.* When asked what fragrance products he believed caused plaintiff's toxic encelopathy, Brautbar admitted that "I can give you the name of the colognes or perfumes that she mentioned, but I don't know what are the

---

**2.** In Part II.D of this Order, the Court addresses defendants' argument that, apart from the *Daubert* problems afflicting plaintiff's experts' testimony more broadly, no testimony regarding MCS should be admitted because there is no reliable scientific evidence that MCS exists as a physiological illness. For the reasons expressed therein, the Court agrees that plaintiff's experts' testimony regarding MCS must be excluded under *Daubert.* This holding constitutes an alternative ground for excluding that part of plaintiff's proffered evidence regarding MCS, and thus an alternative ground for granting summary judgment on the issue of causation as to plaintiff's claimed MCS.

**3.** "Plaintiff's theory in this case is that her exposure to aldehydes contained in the fragrance-scented products caused her symptoms and injuries." Opp. to *Daubert* Mot. at 6. According to Thrasher, aldehydes are a class of compounds "in which a carbon molecule is double bonded to an oxygen molecule" along with a hydrogen atom. Thrasher Depo. 373/22–374/19. These "carbonyl groups" are based on rings of carbons, to which side chains of carbon, oxygen, and/or hydrogen molecules are bonded. *Id.* 82/16–19; 267/11–274/11; 373/22–374/19; Exh. 104–05.

specific fragrance." Brautbar Depo. 56/20–57/1. Brautbar was also asked: "Do you have an opinion as to which specific brands of fragrance products caused an actual injury in Ms. Sanderson's sinuses?" His answer was: "Not specific ones. She described all kind of names, but I don't recall offhand which brands they are." *Id.* 295/4–296/9. (He later recalled that on one occasion, a fragrance product which he was wearing appeared to injure plaintiff, but he didn't know what that product was. *Id.* 296/16–297/6.) [4]

Heuser similarly admitted that he did not have an opinion as to what specific substance(s) caused plaintiff's injuries. Heuser Depo. 67/12–68/4; 339/7–10. Perillo also was unable to identify any specific fragrance product or exposure as causing plaintiff's injuries. Perillo Depo. 115/3–116/5. Perillo agreed that he could not say that "any particular exposure to any specific fragrance on any one occasion necessarily caused or worsened Miss Sanderson's neuropsychological condition." *Id.* 132/2–24. Thrasher was asked: "Are you able to state that in your opinion the unsaturated aldehydes [in Boss and Drakkar Noir] caused any one of Miss Sanderson's injuries as opposed to something else causing those injuries?" He replied, "No, I don't think I can really make that statement." Thrasher Depo. 90/2–22. Later in his deposition, Thrasher reaffirmed that he had no opinion as to whether any specific exposure to any particular fragrance product caused any of plaintiff's injuries. *Id.* 281/9–283/5.

Even without expert testimony that any particular fragrance product or exposure injured plaintiff, she might be able to prove that a particular product was a substantial factor in causing her injuries if there were expert testimony that *all* of the exposures and *all* fragrance products injured her in the same manner and to the same degree, provided that she was exposed to a substantial amount of that product. But plaintiff's experts acknowledge that such is not the case. They admit that not every exposure resulted in an injury (even if it did produce symptoms), and that aldehydes (and therefore fragrance products) differ in their effects on health.

Heuser testified that he could not say that every exposure injured plaintiff. Heuser Depo. 502/7–14; 338/20–339/6 ("not every exposure would have to be injurious"). Thrasher agreed that not every occasion where plaintiff experiences a symptom from exposure to a fragrance product results in an injury. Thrasher Depo. 278/1–281/8. Perillo concurred: "Q: Is it your opinion that every time she reports a symptom when she smells the odor of a fragrance product that means she's sustaining an injury to her brain at that moment? A: No." Perillo Depo. 131/22–132/1.

Thrasher, the only expert qualified to discuss the chemical composition and properties of aldehydes, testified that no two aldehydes have the same chemical composition: "Structure-wise they are not the same, there is just no question about that." Thrasher Depo. 274/22–275/3. He described the different kinds of aldehydes, and testified that different aldehydes have different health effects, based on their different chemical structure. Specifically, he testified that only "unsaturated" aldehydes likely caused plaintiff's injuries: "Q: Is it your opinion that all aldehydes, no matter what they are, and what fragrance product they were contained in, that she was exposed to, caused her injuries? A: No, I didn't say that.... There are certain aldehydes that I'm not overly concerned about.... Those with unsaturated bonds, that's what I'm concerned about." *Id.* 87/12–89/4. He then went through a list of aldehydes contained in Boss that he believed were not dangerous. *Id.* 89/5–90/1. (Even after narrowing it down to the dangerous unsaturated aldehydes in Boss and Drakkar Noir, Thrasher still could not say that those aldehydes caused any of plaintiff's injuries. *Id.* 90/2–22.) Later in his deposition, Thrasher discussed some differences in

---

**4.** If Brautbar's answer is interpreted as an attempt to adopt *plaintiff's* opinion as to which fragrance products caused her injuries, it's not admissible expert opinion testimony. *Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 424 (5th Cir. 1987) (an expert's testimony that merely repeats a layperson's oral history "is no more than [lay] testimony dressed up and sanctified as the opinion of an expert").

health effects of different aldehydes. *Id.* 277/4–21.[5]

The evidence may be summarized as follows: Plaintiff was exposed to countless different fragrance products, most of which she can't identify. She was exposed to fragrance products more than 16,000 times. Her experts say that she sustained various injuries from these exposures, or that they exacerbated existing injuries originally caused by exposure to formaldehyde in the past. None of the experts can tie any injury to any particular fragrance product or exposure. Plaintiff says she was exposed to IFF's products between 22 and 32 times, out of the total of more than 16,000. Her experts admit that not every exposure caused an injury and that different aldehydes have different health effects, meaning that different fragrance products posed different risks.

Therefore, no matter how small a defendant's contribution can be and still be a "substantial factor" in causing a plaintiff's injuries, here there is no evidence that any defendant's products made *any* contribution whatever. Based on the expert testimony presented, a jury could not find that IFF's products were a substantial factor in causing plaintiff's injuries. It could not find that Calvin Klein's products were a substantial factor, or that Cosmair's products were a substantial factor, or that any other particular defendant's products were a substantial factor in causing any injury to plaintiff. At best, plaintiff could prove that exposure to fragrance products caused her injuries and that she was exposed to defendants' fragrance products. But that establishes only a "mere possibility" that defendants' fragrance products were the ones that caused her injuries, and even less of a possibility that any one defendant's products caused them. Such

a "mere possibility" is not enough. *Jones,* 209 Cal.Rptr. at 460; *Cottle,* 5 Cal.Rptr.2d at 892; *Beech Aircraft Corp. v. United States,* 51 F.3d 834, 838 (9th Cir.1995) (applying California law). Unless plaintiff is somehow relieved of proving by expert testimony that each defendant caused her to suffer injury, she cannot recover against any of them.[6]

### B. Plaintiff's "Common–Sense" Approach to Causation

Plaintiff's next argument is that she doesn't need to prove causation by expert testimony. She contends that her "sensation of pain immediately following each of her more than 16,000 exposures to fragrance products, including defendants' fragrance products, is sufficient to create a triable issue of material fact" as to causation. Opp. to Causation Mot. at 1.

Two responses are in order. First, the California authorities mentioned above require that causation be proved by expert medical evidence. The etiology of the injuries plaintiff claims (MCS, small airways disease, toxic encelopathy) is beyond the experience of laypeople. That is the law which this Court is bound to apply in this case. Second, even on its own terms, plaintiff's argument fails, because (as discussed in the last section) her experts testify that she did *not* sustain an injury each time she experienced a symptom from exposure to a fragrance product. Thus, even if the "temporal connection" which plaintiff emphasizes could suffice to prove that defendants' products caused her to experience certain symptoms, it does not suffice to prove that defendants' products caused her MCS, toxic encelopathy, chronic nasal problems, or small airways disease. Since those are the injuries she's suing for—

---

5. Brautbar (who is not a chemist) testified that while he did not know offhand whether there were differences in health effects among different aldehydes, "I'm sure there are." Brautbar Depo. 328/3–329/25.

6. Plaintiff argues that she has "submitted competent expert testimony establishing the bases for [her experts'] opinions that plaintiff's current condition was caused to a medical and toxicologic probability by plaintiff's exposure to fragrance

products, which necessarily includes defendants' fragrance products." Opp. to Causation Mot. at 16. But unless a case meets the criteria for market-share liability, "exposure to fragrance products" does not "necessarily include defendants' fragrance products." Thus, while it may be true that plaintiff's evidence would support a finding that her condition was caused by her exposure to fragrance products, that doesn't help her recover against any particular defendant.

not the ephemeral sensation of pain upon smelling a perfume—her theory doesn't help her.[7]

Plaintiff's argument misconceives her causation burden. She objects: "How many thousands of times does plaintiff need to develop symptoms immediately following exposure to fragrance products for an expert or a layman with the assistance of expert testimony to find that the relationship is more than one of possible coincidence?" Opp. to Causation Mot. at 20. The answer is that that's the wrong question: even if plaintiff developed symptoms upon exposure to fragrance products an infinite number of times, that wouldn't get her anywhere as to IFF, Calvin Klein, Lancaster, Cosmair, or any other particular defendant. To hold a defendant liable, a plaintiff has to prove that that defendant's conduct was a substantial factor in causing her injuries. Plaintiff's only hope of meeting her causation burden lies in shifting it to defendants.

### C. Plaintiff's Argument for Shifting the Burden on Causation

As discussed above, plaintiff appears to recognize that this case does not meet the *Sindell* criteria for market share liability or the *Summers v. Tice* criteria for alternative liability. She therefore urges the Court to adopt "some type of modified market share theory of liability." Opp. to Causation Mot. at 21.

California law recognizes two burden-shifting theories, applicable in different and narrowly circumscribed circumstances. As will be seen, neither theory applies in this case.

#### 1. Summers v. Tice: "Alternative Liability"

■ First, in *Summers v. Tice*, 33 Cal.2d 80, 86, 199 P.2d 1 (1948), the supreme court held that burden-shifting is appropriate under the theory of "alternative liability" when the plaintiff has sued *all* of the persons who may have caused her injury, they all acted tortiously, and it is certain that one of the defendants actually caused the plaintiff's damages. *See Sindell*, 163 Cal.Rptr. at 139, 607 P.2d at 931. This "alternative liability" is joint and several, not proportionate to the defendant's market share as in *Sindell*.

■ The California courts have adhered strictly to the requirement that *all* potentially responsible defendants be sued. In *Sindell*, the supreme court explicitly rejected the *Summers* theory of liability because "[t]here, all the parties who were or could have been responsible for the harm to the plaintiff were joined as defendants. Here, by contrast, there are approximately 200 drug companies which made DES, any of which might have manufactured the injury-producing drug." *Id.* The courts of appeal have also confined application of alternative liability to cases where all potentially responsible parties have been sued. The *Lineaweaver* court's discussion is especially apposite:

> Unlike *Summers*, there are hundreds of possible tortfeasors among the multitude of asbestos suppliers. As our Supreme Court has recognized, the probability that any one defendant is responsible for plaintiff's injury decreases with an increase in the number of possible tortfeasors. [*citing Sindell*, 163 Cal.Rptr. at 139, 607 P.2d at 931] When there are hundreds of suppliers of an injury-producing product, the

---

7. *See* Opp. to Causation Mot. at 1 ("Plaintiff's claim in this action is that her over 16,000 exposures to numerous types of fragrance products, some of which she can identify by name, and some of which she cannot, caused her to suffer injuries including chronic nasal and sinus irritation, toxic encelopathy (brain disease), small airway disease and multiple chemical sensitivity."). *See also* Pl.Resp. to Interr. No. 22 ("Plaintiff does not contend that she sustains a new, separate and/or distinct injury each time she has symptoms from exposure to perfumes and other fragrance products. Plaintiff's exposure to perfume and fragrance products, as alleged in the com-

plaint, has made her sensitive to a myriad of chemicals, including most fragrances. Sensitivity, in this context, means that she suffers adverse physical reactions, or symptoms, from her exposures. While a person who is chemically hypersensitive may be exposed to chemicals which make his or her condition worse (beyond just having more symptoms), plaintiff has not alleged that same occurred in her case."). "Plaintiff is bound by an admission in [her] pleadings." *Setliff v. E.I. DuPont de Nemours & Co.*, 32 Cal. App.4th 1525, 38 Cal.Rptr.2d 763, 767 (3 Dist. 1995) (citation omitted).

probability that any of a handful of joined defendants is responsible for plaintiff's injury becomes so remote that it is unfair to require defendants to exonerate themselves. [*Id.*] The probability that an individual asbestos supplier is responsible for plaintiff's injury may also be decreased by the nature of the particular product. Asbestos products have widely divergent toxicities. [citation] Unlike the negligent hunters of *Summers,* all asbestos suppliers did not fire the same shot. Yet, under a burden shifting rule, all suppliers would be treated as if they subjected plaintiff to a hazard identical to that posed by other asbestos products.

37 Cal.Rptr.2d at 907. Plaintiff here relies on *Menne v. Celotex Corp.,* 861 F.2d 1453, 1464–70 (10th Cir.1988) (applying Nebraska law) in arguing that since she has proven that she was injured by exposure to fragrance products and that she was exposed to defendants' fragrance products, defendants should bear the burden of proving that it was not their fragrance products that caused the injuries. But the *Lineaweaver* court expressly rejected that precise argument:

> In truth, *Menne* and the concurring opinion would require every joined defendant to exonerate itself upon nothing more than plaintiff's showing of exposure to defendants' asbestos products, some of which *may* have caused harm. Again, we return to probabilities and, as discussed, the probability that a particular asbestos supplier joined as a defendant has caused a plaintiff's injury is often remote given the hundreds of possibly responsible parties and the unequal hazards posed by different asbestos products.

37 Cal.Rptr.2d at 908 (emphasis in original).

Another very recent court of appeal case "decline[d] to expand the doctrine of alternative liability" where the plaintiff did not contend that "all potential tortfeasors have been joined." *Setliff v. E.I. DuPont de Nemours & Co.,* 32 Cal.App.4th 1525, 38 Cal.Rptr.2d 763, 768 (3 Dist.1995).

Plaintiff relies on *Pereira v. Dow Chemical Co., Inc.,* 129 Cal.App.3d 865, 181 Cal.Rptr. 364 (1 Dist.1982), in which the plaintiff alleged that exposure to four different chemicals caused his kidney damage. The court held that "[u]nder the circumstances, it is not plaintiff's duty to identify which of the vapors caused or contributed to the chronic renal failure but, rather, it is the duty of the defendants who supplied Midcor with their products to prove the contrary." *Id.,* 181 Cal.Rptr. at 368. The court cited *Summers'* explanation that "[t]he real reason for the rule that each joint tortfeasor is responsible for the whole damage is the practical unfairness of denying the injured person redress simply because he cannot prove how much damage each did, when it is certain that between them they did all; let them be the ones to apportion it among themselves." *Id.* (*citing Summers,* 33 Cal.2d at 85–86, 199 P.2d 1). In the instant case, in contrast, plaintiff is not merely unable to prove *"how much"* damage each defendant did; she can't prove that any defendant did any damage. And it is most emphatically not "certain" that between all of the defendants, they caused all of plaintiff's injuries.

Plaintiff's only other authorities are a court of appeal case in which review was granted and which therefore cannot be cited [8] and the Restatement. The Restatement includes a Comment that does not rule out extension of alternative liability to cases where all potential tortfeasors are not before the court:

> The cases thus far decided in which the rule stated in Subsection (3) has been applied all have been cases in which all of the actors involved have been joined as defendants.... It is possible that cases may arise in which some modification of the rule stated may be necessary because of complications arising from the fact that one of the actors involved is not or cannot be joined as a defendant.... Since such cases have not arisen, and the situations

8. *Coughlin v. Owens–Illinois, Inc.,* 49 Cal. App.4th 1879, 27 Cal.Rptr.2d 214, 219–23 (1 Dist.1993), *rev. granted,* 29 Cal.Rptr.2d 538, 871 P.2d 1134 (Apr. 21, 1994). The California supreme court did not specify what issue or issues it agreed to review, and the case has been on review now for more than two years. A decision of which review has been granted may not be cited unless ordered published by the supreme court. Cal.R.Ct. 976(d), 977(a), (b).

which might arise are difficult to forecast, no attempt is made to deal with such problems in this Section. The rule stated in Subsection (3) is not intended to preclude possible modification if such situations call for it.

Restatement 2d Torts, § 433B, cmt. h, at 446.

But the Restatement offers plaintiff no help. For one, it doesn't even advocate the position plaintiff takes here. More importantly, the court of appeal considered this very Comment in *Setliff*, but was unpersuaded. *See* 38 Cal.Rptr.2d at 768.

The Court therefore holds that, under California law, plaintiff cannot shift the causation burden to defendants under *Summers* because she has not sued all potentially responsible parties.[9]

### 2. *Sindell: Market–Share Liability*

■ The other doctrine which California law provides for shifting the causation burden is the market-share liability theory first applied in *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980). Unlike *Summers*, the *Sindell* doctrine applies where the plaintiff has *not* sued all potentially responsible parties, and it imposes liability in proportion to the defendant's market share, rather than the joint and several liability imposed under *Summers*. This doctrine may be summarized as follows: "Under the market share liability theory of liability, a plaintiff harmed by a fungible product that cannot be traced to a specific producer may sue various manufacturers of the product if the plaintiff joins a substantial share of those makers as defendants." *Setliff*, 38 Cal.Rptr.2d at 769 (*quoting Richie v. Bridgestone/Firestone, Inc.*, 22 Cal.App.4th 335, 27 Cal.Rptr.2d 418, 421 (1 Dist.1994)).

■ The supreme court in *Sindell* emphasized that there was no unfairness in dispensing with individualized proof of causation as

among the various potential tortfeasors because their products were identical. Since the DES manufactured by the 200 potential tortfeasors was all produced from the same formula, it is more accurate to speak of a single product, with many manufacturers. *See* 163 Cal.Rptr. at 144–45, 607 P.2d at 936–37; *Mullen v. Armstrong World Industries, Inc.*, 200 Cal.App.3d 250, 246 Cal.Rptr. 32, 35 (1 Dist.1988) (observing that the *Sindell* court "took pains to establish that it was dealing with 'fungible goods'—specifically, a drug produced 'from an identical formula' ").

Just as the court of appeal in *Mullen* held that asbestos was not the "simple equivalent[ ]" of DES, the fragrance products which plaintiff contends caused her injuries are not fungible goods made from an identical formula and therefore cannot be equated with the DES at issue in *Sindell*. *Mullen*, 246 Cal. Rptr. at 35–36. The only difference between DES manufactured by Eli Lilly and DES manufactured by Abbott was the return address on the package sent by the manufacturer to the pharmacy. Such is not the case here. Plaintiff does not allege that the various defendants' fragrance products are identical; Drakkar Noir and Cool Water and the rest of defendants' perfumes and colognes differ in their composition, not just in the name on the package. What's more, plaintiff's experts acknowledge that different aldehydes have different health effects. Since different fragrance products contain different aldehydes at different concentrations and in different combinations, it cannot be said that plaintiff is targeting a single product made by many manufacturers.

Plaintiff appears to recognize that her case doesn't really fit *Sindell*'s criteria, so she advocates the acceptance of a "modified" version of the market-share theory. But it would be inappropriate for this Court to adopt an extension of that California doctrine here, because the California cases since *Sindell* have limited market-share liability to the circumstances described in *Sindell*.

---

**9.** Plaintiff objects that the reason she hasn't sued all potential defendants is that she has been denied discovery that would enable to her to identify them. This argument is frivolous. Plaintiff admits, as discussed in the previous section, that she can't identify most of the fragrance products that she was exposed to and that she thinks injured her. Therefore, as defendants argue, "no amount of discovery would enable her to identify and sue the manufacturers of those products." IFF Reply on Causation Mot. at 9 n. 9.

In *Mullen*, the court refused to apply the market-share theory because the various defendants' asbestos products were not identical: because "plaintiffs are attacking an entire industry, not seeking recovery for damages caused by a single fungible product 'carrying with it a singular risk factor,'" "the prerequisite of fungibility has not been demonstrated." 246 Cal.Rptr. at 37 (*quoting Case v. Fibreboard Corp.*, 743 P.2d 1062, 1066 (Okla.1987)). All of the asbestos products shared an important characteristic in that they all contained asbestos fibers, but they also possessed divergent characteristics, such as "'the specific type of asbestos fiber incorporated into the product; the physical properties of the product itself; and the percentage of asbestos used in the product.'" *Id.* at 36 (*quoting Celotex Corp. v. Copeland*, 471 So.2d 533, 537–38 (Fla. 1985)). Similarly, in the instant case, defendants' fragrance products all (at least allegedly) contain aldehydes, but each contains different types of aldehydes, with different physical properties, at different levels of concentration. It would therefore be contrary to *Mullen* to apply the market-share theory in this case.[10]

Moreover, the market-share theory is inapplicable in this case because plaintiff has not joined as defendants a substantial share of the market. In *Sindell*, the supreme court did not specify a market-share percentage that would have to be before the court for the doctrine to apply; it merely stated that the determination of market share could not be accomplished at the pleading stage at which the action had been dismissed. 163 Cal.Rptr. at 145–46, 607 P.2d at 937.[11]

Five years after *Sindell*, the supreme court held that a ten percent market share was insufficient to permit application of the market share liability doctrine. *Murphy v. E.R. Squibb & Sons, Inc.*, 40 Cal.3d 672, 221 Cal.Rptr. 447, 455, 710 P.2d 247, 254–55 (1985). The court explained that "if the plaintiff joined in the action the manufacturers of a substantial share of the DES which her mother might have taken, the injustice of shifting the burden of proof to defendants to exonerate themselves would be significantly diminished." *Id.*, 221 Cal.Rptr. at 455, 710 P.2d at 255. Similarly, it was not unjust to require the two defendants in *Summers* to exonerate themselves, since there was a 50 percent chance that each of them was the tortfeasor. *Id.* The court concluded that a ten percent chance that Squibb was the tortfeasor, compared to a 90 percent chance that a manufacturer *not* joined as a defendant was the tortfeasor, was not sufficient to meet the substantial market share prong of the doctrine. *Id.*

Plaintiff has not even attempted to show that she has joined a substantial share of the fragrance product market (and considering the size of that market, the Court strongly doubts that she has).[12]

The Court therefore holds that, under California law, plaintiff cannot shift the causation burden to defendants under *Sindell*, be-

---

**10.** A court of appeal case on which plaintiff relies, *Wheeler v. Raybestos–Manhattan*, 8 Cal. App.4th 1152, 11 Cal.Rptr.2d 109 (1 Dist.1992), is distinguishable. In that case, the court held that asbestos-containing brake pads were sufficiently fungible where they "were all composed solely of chrysotile asbestos fiber" in "roughly comparable quantities." *Id.* 11 Cal.Rptr.2d at 111. In contrast, defendants' fragrance products do not all contain the same aldehyde or aldehydes in roughly the same quantity. Notably, the court in *Wheeler* reaffirmed its decision four years prior in *Mullen*, in which it held that various asbestos products were not fungible for purposes of *Sindell*. As discussed above, *Mullen* is much more analogous to the instant case, and *Wheeler* is highly distinguishable.

**11.** Throughout its opinion, the court relied heavily on a law review article which suggested that 75 to 80 percent of the market would have to be joined as defendants, but the court declined to pick a specific number: "we hold only that a substantial percentage is required." 163 Cal. Rptr. at 145, 607 P.2d at 935; Comment, "DES and a Proposed Theory of Enterprise Liability," 46 *Fordham L.Rev.* 963, 996 (1978).

**12.** The Court is also concerned that, since plaintiff's theory is that aldehydes caused her injuries, the relevant market might be not just fragrance products, but all products to which she was exposed that contain aldehydes. Plaintiff and her experts concede that aldehydes are contained in a wide variety of products, including fruit products, air fresheners, laundry detergents, soap, shaving cream, aftershave, potpourri, and incense. *See* Tr. of Dec. 13, 1995 Hearing at 38; Tr. of Feb. 12, 1996 Hearing at 10, 12; Thrasher Depo. 120/9–121/17.

cause plaintiff was not injured by a fungible product made by many different manufacturers and because plaintiff has in any event not joined a substantial share of the market for the products that she alleges injured her.[13]

## II.

### *DAUBERT*

Although defendants filed their motion for an order excluding plaintiff's expert witnesses on the issue of causation ("*Daubert* motion") as a separate document from their motion for summary judgment on the issue of causation, the *Daubert* motion is in reality an alternative argument as to why plaintiff has not established a genuine issue of fact as to whether she can prove causation. In other words, defendants' causation motion argued that even if all of plaintiff's experts' testimony on the issue of causation was admitted, it did not create a triable factual dispute thereon; defendants' *Daubert* motion argues that plaintiff's experts' testimony on the issue of causation is in any event inadmissible.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court set forth a new test for the admissibility of expert scientific evidence, replacing the theretofore-dominant test derived from *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir. 1923). The test laid down in *Daubert* has two components. First, a court must determine "whether the experts' testimony reflects 'scientific knowledge,' whether their findings are 'derived by the scientific method,' and whether their work product amounts to 'good science.' " *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1315 (9th Cir.1995) ("*Daubert on remand* "), *cert. denied,* —— U.S. ——, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995) (*quoting Daubert,* 509 U.S. at 590, 593, 113 S.Ct. at 2795, 2797). Second, the court "must ensure that the proposed expert testimony is 'relevant to the task at hand,' i.e., that it logically advances a material aspect of the proposing party's

case." *Id. (quoting Daubert,* 509 U.S. at 593–95, 113 S.Ct. at 2797). The first prong may be referred to as the "reliability" requirement, and the second prong is sometimes known as the "fit" requirement. *Id.* Plaintiff, as the proponent of the expert testimony, bears the burden of showing that both prongs are satisfied. *Id.* at 1315, 1316, 1318 n. 10.

Defendants argue that plaintiff's experts—Brautbar, Heuser, Perillo, and Thrasher—fail both prongs of *Daubert.* They further argue that the testimony of Brautbar, Heuser, and Perillo on the issue of causation should be excluded because plaintiff did not designate them to testify as to causation and because they did not submit Rule 26(a)(2)(B) expert witness reports as to causation. (Plaintiff designated them to testify only to the nature, extent, and physiological reality of her injuries.) In addition, they argue that Perillo, a neuropsychologist who has no training in medicine, toxicology, or chemistry, does not qualify as an expert on the issue of causation. Lastly, they argue that all testimony as to MCS should be excluded because MCS does not exist as a recognized medical condition.

### A. *Reliability*

1. *Plaintiff's experts did not rely on their own research, on published research by others, or on other objective sources*

To demonstrate the reliability of proffered scientific evidence, an expert's "bald assurance of validity is not enough. Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Id.* at 1316. The Ninth Circuit discussed the dangers of relying on litigation-related research, and concluded "[t]hat the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for con-

---

13. The Court notes that it delayed defendants' summary judgment motions to allow plaintiff time to seek to add new defendants, including nondiverse defendants if she believed it neces-

sary to do so. *See* Order Denying Pl.Mot. to Remand, filed April 17, 1996. Plaintiff did not attempt to add any new defendants in response to that Order.

cluding that the opinions he expresses were derived by the scientific method." *Id.* at 1317 (internal quotation marks omitted).

Thus, the best way for an expert to provide the requisite "objective, independent validation" of his methodology is to show that his conclusions are based on his own research, and that his research is legitimately scientific (*i.e.,* "whether it's been subjected to peer review and publication; whether it can be and has been tested; and whether the known or potential rate of error is acceptable," *id.* at 1316 (*quoting Daubert,* 509 U.S. at 591–95, 113 S.Ct. at 2796–97)).

■ Here, none of plaintiff's experts can do this, because none has conducted any research (either before or during this litigation) regarding the health effects of defendants' fragrance products or the aldehydes contained therein.[14] Plaintiff's opposition does not allege that any of her experts has conducted any such research. (None of plaintiff's experts has even conducted uncontrolled, informal tests on plaintiff to determine the effects on her of exposure to fragrance products.)

The next way a proponent of expert testimony can demonstrate its reliability is by showing that, in forming his opinion, the expert relied on "research and analysis [that] have been subjected to normal scientific scrutiny through peer review and publication." *Id.* at 1318. Thus, even if the expert has never done any relevant research of his own, his testimony could be reliable if he relies on the published work of others, since "[t]hat the research is accepted for publication in a reputable scientific journal after being subjected to the usual rigors of peer review is a significant indication that it is taken seriously by other scientists, i.e., that it meets at least the minimal criteria of good science." *Id.*

Here, plaintiff cannot make such a showing, because there is *no* published work showing that fragrance products or aldehydes cause any of the injuries which plaintiff claims to have. Thus, plaintiff does not contend that her experts' opinions are reliable because they relied on published scientific literature showing that fragrances or aldehydes can cause the type of injuries which she claims to have. Indeed, her opposition admits that there is no such literature. *See* Opp. to *Daubert* Mot. at 11 ("the fact is that fragrance chemicals are not tested for neurotoxicity or other chronic effects"); *id.* at 13 (there is a "dearth of research on the neurotoxic effects of fragrances and fragrance chemicals").

Even if an expert did not rely on published, peer-reviewed research in coming to his conclusions, his testimony is not necessarily unreliable. *Daubert on remand,* 43 F.3d at 1319 ("the experts must explain precisely how they went about reaching their conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field"). But plaintiff cannot make any of these alternative showings either, because there are no learned treatises or professional associations that say fragrance products or aldehydes can cause the injuries which plaintiff claims to have.[15] The secondary sources mentioned in plaintiff's opposition do not mention any of plaintiff's claimed injuries or

---

**14.** The closest any of them comes is Brautbar's mention of a study he conducted called "Industrial Exposure to Solvents and Immune System Dysfunction." *See* CV attached to Brautbar Decl. in Pl.App. of Evidence at #142. In his deposition, Brautbar thought he recalled that among the substances tested in this study were glutaraldehyde and acetaldehyde, but he offered no information about the study, and did not state that he relied on it in coming to his conclusion that the aldehydes in defendants' fragrance products caused plaintiff's injuries. Brautbar Depo. 220/4–221/20. Plaintiff has not proffered this study, so the Court cannot hold that she has shown that it constitutes an objective, independent validation of Brautbar's testimony. In addition, Heuser says he did brain scans of 8 or 9 people who had sniffed a fragrance, but he admitted that this "experiment" was "not very scientific" and that he "never published that because we don't have any controls, it was just an initial impression." Heuser Depo. 88/1–91/14.

**15.** The Court questions how often, practically speaking, a "learned treatise" or a professional association will state as true a proposition not supported by any published research.

discuss a methodology for determining whether fragrance products or aldehydes have caused particular injuries, and none of plaintiff's experts said he relied on any of them in coming to his conclusions, much less "explain[ed] precisely how [he] went about reaching [his] conclusions." *See Claar*, 29 F.3d at 502–03 ("Coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method"); *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 423 n. 2 (5th Cir.1987) ("We agree that an expert who forms an opinion before he begins his research is biased and lacking in objectivity").[16]

### 2. *Plaintiff's attempt to evade Daubert: the "Thrasher test"*

Perhaps because she clearly cannot meet its requirements, plaintiff does not even cite *Daubert on remand* or the Supreme Court's opinion in *Daubert*. Instead, plaintiff invokes a test of her own: the "Thrasher test."

Plaintiff concedes that "[t]he only expert who is testifying on the ultimate issue of causation on plaintiff's behalf is Dr. Thrasher." Opp. to *Daubert* Mot. at 4. Plaintiff explains the methodology that Thrasher used in concluding that plaintiff's injuries were caused by the aldehydes in the fragrance products to which she was exposed.

Thrasher declares that he asked six questions: "(1) was the patient exposed to a chemical which is toxic? (2) was the patient exposed to enough of the toxic chemical to produce a toxic injury?; (3) is there a temporal or other relationship between the exposure to the toxic chemical and the development of physical symptoms?; (4) have other possible causes for the physical symptoms been ruled out? (5) have the physical symptoms been tied to objective medical evidence of abnormality? and (6) are all of the patient's symptoms and lifestyle changes taken as a whole consistent with other cases of known chemical injury?" Thrasher Decl. ¶ 14. Plaintiff concedes that the testimony of Heuser, Brautbar, and Perillo "is intended only to satisfy certain prongs of the test set forth by Thrasher to establish causation," specifically prongs 4, 5, and 6. Opp. to *Daubert* Mot. at 4.

The Court will not go into detail about whether Thrasher's "test" is satisfied, because it's not a reliable, scientifically valid test. First, plaintiff bears the burden of showing that Thrasher's methodology constitutes "the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Daubert on remand*, 43 F.3d at 1319. Plaintiff has not presented evidence that even one single other scientist follows Thrasher's methodology. As best anyone could tell from the evidence before the Court, Thrasher simply made it up. That's hardly the "objective, independent validation" required under *Daubert*. In fact, none of the publications cited by any of plaintiff's experts mentions *any* methodology for determining whether fragrance products or aldehydes have caused the injuries claimed by plaintiff.

Furthermore, the Court believes that Thrasher's test is invalid. Consider this hypothetical: A plaintiff has a broken foot. He was exposed to large quantities of dioxin not long before he broke his foot. He's not

---

**16.** Although plaintiff's opposition doesn't mention any of the following, the Court briefly notes certain exhibits: Exh. 107–109, which Brautbar brought to the second session of his deposition as support for his conclusion that aldehydes in fragrance products caused plaintiff's MCS, toxic encelopathy, small airways disease, and dysosmia, deal only with adverse effects of fragrances on asthmatics (which plaintiff is not), and Exh. 106 deals with chemicals and injuries that aren't at issue here (besides stating itself that it is of little scientific use). In any event, Brautbar didn't testify that he relied on these in coming to his conclusion on causation. The same goes for Exh. 157 and 158, which Brautbar brought to a later session. They mention fragrances, but state

only that they can cause dermatitis; they don't mention any of the injuries for which plaintiff is suing. Heuser mentioned Exh. 86, a study of 35 purported MCS sufferers. But none of the 35 alleged that fragrance products caused his or her MCS, and the article expressly declines to posit a causal connection between fragrance exposures and MCS. Heuser also mentioned the Material Safety Data Sheet ("MSDS") for benzaldehyde (Exh. 130), which is present in Boss and Drakkar Noir (IFF's products), but the MSDS says nothing about any of plaintiff's claimed injuries and Heuser didn't see it until a year after he formed his causation opinion. Heuser Depo. 87/6–11; 289/3–17; 296/17–298/5.

malingering and it's not psychosomatic—his foot really is broken. He has no idea how he broke it; normal causes such as tripping and falling, sports injuries, and the like have been ruled out. All of Thrasher's criteria are satisfied. Does that mean an orthopaedist can draw a scientifically valid conclusion that the dioxin caused the broken foot? Of course not, because there is no reliable scientific evidence that dioxin causes broken feet.

The same statement applies here. *There is no reliable scientific evidence that aldehydes in fragrance products cause MCS, toxic encelopathy, small airways disease, or dysosmia.* While it is not as far-fetched to label the injuries of which plaintiff complains "toxic injuries" as it would be so to label a broken foot, the important point is that there is no scientific proof of the causal connection, and under *Claar* there has to be.

To take a less obvious hypothetical, consider a plaintiff who has been exposed at his workplace to large quantities of chemicals which he believes to be toxic. He claims several injuries, including "dyscalculia" (poor arithmetic ability) and "spelling dispraxia" (poor spelling ability), which he alleges are the result of brain injuries caused by the chemical exposures. He really does have dyscalculia and spelling dispraxia—he can't add or spell to save his life. The chemicals to which he was exposed are known to be capable (at certain concentrations and under certain circumstances) of causing certain injuries, such as contact dermatitis (when the chemicals touch the skin) and ashthma (when the chemicals are inhaled). Other causes of poor math and spelling ability (such as borderline mental retardation, certain discrete learning disabilities, and not attending school) have been ruled out.

Under Thrasher's test, the chemical exposures can be found to have caused the "dyscalculia" and "spelling dispraxia" (at least if those "injuries" manifested themselves after the exposures began). But there is no scientifically reliable evidence that exposures to those chemicals can cause those injuries. It's not inherently implausible like the dioxin/broken foot example, but there's no scientific evidence of a causal connection.

This hypothetical is an amalgam of *Claar* and the instant case. It could conceivably be scientifically established that aldehydes are capable of causing or exacerbating skin problems such as dermatitis as well as asthma. *See* Exh. 107, 108, 109 (studies proffered by Brautbar finding adverse effects from fragrance exposures in asthmatics); Thrasher Decl. ¶ 11; Thrasher Depo. 122/13–125/4; Exh. 103 (publications indicating that aldehydes are allergens that can cause dermatitis). But plaintiff doesn't have asthma, and isn't suing for the dermatitis which she suffered in 1991 (because she believes it was caused by the lotion which she used at the time, rather than exposures to perfumes and colognes). Pl. Depo. 1664/20–23; 1799/25–1800/3; 12/13/95 Tr. at 63; Pl. Resp. to Interr. No. 8. The Ninth Circuit's conclusion in *Claar* disposes of plaintiff's argument:

> the district court found that the toxicology sections of the affidavits, which summarize the scientific literature discussing evidence that particular chemicals can cause particular injuries (and which thus are a necessary foundation for any conclusions the experts might draw), fail to discuss the majority of the medical conditions alleged by plaintiffs. Consequently, the court correctly determined that there is no evidence that the experts' conclusions about the cause of these conditions are based on anything more than subjective belief and unsupported speculation.

29 F.3d at 502. This case is a fortiori, because the experts' declarations don't reveal reliable scientific evidence that *any* of the injuries claimed by plaintiff could have been caused by the particular chemicals alleged to be the culprits here.

The teaching of the cases is that it is not enough that there be reliable scientific evidence that a particular chemical can cause a particular injury and that it be plausible that a second chemical could also cause that injury, or that the first chemical could also cause a different injury. Plausibility does not equal reliability; only "objective, independent validation" equals reliability.

a. *Thrasher's reliance on other chemicals and other injuries*

Thrasher states that he relied on scientific literature involving individuals with similar

health problems but who were injured *"not necessarily with fragrances but from other chemicals."* Thrasher Depo. 177/8–16 (emphasis added). In addition to relying on chemicals other than those which plaintiff claims injured her, Thrasher also relied on fragrance products' ability to cause injuries other than those claimed by plaintiff. In his declaration, Thrasher states as follows:

> In response to the question of whether Ms. Sanderson was exposed to toxic chemicals, I can state unequivocally that formaldehyde is a toxic chemical. At low levels it is an irritant and at higher levels it will destroy living cells. With respect to fragrance products to which Ms. Sanderson was or might have been exposed, I am only informed about the content of aldehydes in the concentrated fragrance oils for Boss and Drakkar Noir fragrance products. As to these aldehydes, the statement contained in the monograph for benzaldehyde appears applicable. It states, 'Thomas (1958) reported ... that benzaldehyde, *like other aldehydes and aldehyde-containing essential oils, was strongly irritating to the skin.'*
>
> Based upon the foregoing statement and others which appear throughout the monographs and other research referred to hereinabove, it is my opinion that fragrance materials including but not limited to aldehydes, ketones, acetals and acetates are not only skin irritants, they are also sinus and respiratory tract irritants but to an even greater degree than they are skin irritants. This is due to the fact that the skin has an epithelial layer which protects it from irritants, whereas mucous membranes and the tissue comprising the respiratory tract have no such protective layer.

Thrasher Decl. ¶ 15; Opp. to *Daubert* Mot. at 6–7 (emphasis added by plaintiff).

The fact that plaintiff underscored the statement that aldehydes are "strongly irritating to the skin" is extremely telling. The fact, if it be a fact, that aldehydes are irritating to the skin and can cause dermatitis, does *not* show that they can cause MCS, toxic encelopathy, small airways disease, or dysosmia. Thrasher's deduction that skin irritants would be more powerful respiratory irritants is not implausible, but it's based solely on his subjective belief—not research of his own, not the peer-reviewed scientific literature, not learned treatises, not the statement of a professional association: nothing. It is therefore not reliable under *Daubert on remand.*

The closest Thrasher comes to a basis for his belief that aldehydes can cause the injuries of which plaintiff complains is in his mention of two studies that show central nervous system (CNS) effects from massive and chronic administration of benzaldehyde (which is present in Boss and Drakkar Noir) in rats. Exh. 102. The enormity of the dosages in the two studies, extrapolating linearly, would indicate that plaintiff would have had to drink millions of bottles of fragrance in order to experience the effects which the rats experienced. One of the studies expressly warns that "it is impossible to extrapolate from this study to human exposures." Laham et al. at 508 (Exh. 102). Thrasher admitted that he had no information about the benzaldehyde dosages that would be required to induce CNS effects in humans, and admitted that he could not draw any conclusive opinion from the rat studies as to whether benzaldehyde had had any effect on plaintiff. Thrasher Depo. 125/6–127/19; 293/8–294/15. In addition, while these studies demonstrated CNS effects, which are not merely dermatitis or asthma and might suggest the capability of causing the injuries claimed by plaintiff, they did not actually demonstrate the specific injuries claimed by plaintiff.

▮ Nor has plaintiff presented any evidence that "at least a recognized minority" of experts in the field believe that, despite the warnings of the study's authors, animal studies at extremely high doses may be reliably extrapolated to humans at very low dosages. "[I]n order for animal studies to be admissible to prove causation in humans, there must be good grounds to extrapolate from animals *to humans, just as the methodology of the studies must constitute good grounds to* reach conclusions about the animals themselves. Thus, the requirement of reliability, or 'good grounds,' extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the

particular case." *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 743 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995); *Joiner v. General Electric Co.,* 864 F.Supp. 1310, 1322–24 (N.D.Ga.1994). Perhaps in recognition of these various problems, plaintiff doesn't mention these studies in her opposition.

Thrasher's reliance on chemicals other than those which plaintiff alleges injured her and on the ability of fragrance products to cause injuries other than those from which plaintiff claims to suffer in order to conclude that fragrance products caused plaintiff's injuries fails *Daubert's* reliability standard. *Claar,* 29 F.3d at 502 (experts' testimony about cause of injuries at issue was based on mere "subjective belief and unsupported speculation" where the scientific evidence they relied on didn't discuss the majority of the injuries alleged by the plaintiff); *Valentine v. Pioneer Chlor Alkali Co., Inc.,* 921 F.Supp. 666, 673–74 (D.Nev.1996) (excluding experts who would have testified that exposure to chlorine gas caused plaintiffs' CNS problems in part on ground that while the "disastrous effects [of chlorine gas] on the human pulmonary system are not reasonably capable of question," experts' claims regarding chlorine gas's effects "on the human brain and central nervous system" were "novel … and unsupported by scientific research extraneous to this litigation"); *Grimes v. Hoffmann–LaRoche, Inc.,* 907 F.Supp. 33, 38 (D.N.H.1995) ("even if it were generally accepted that *some* photosensitive chemicals will produce cataracts if they become photobound to lens protein, that general proposition would not fit the facts of this case unless one could reliably draw an analogy between those photosensitive chemicals and Accutane") (emphasis in original) (*citing* Federal Judicial Center, *Reference Manual on Scientific Evidence* 83–84 (suggesting that an expert who bases an opinion on a proposed analogy that has not been investigated should not be permitted to testify because he is offering a "hunch" rather than an

"explanatory theory")); *Cavallo v. Star Enterprise,* 892 F.Supp. 756, 766 (E.D.Va.1995) ("While Rule 802 does not necessarily mandate that the expert find a study linking the *exact* chemicals at the *exact* exposure levels with the *exact* illnesses at issue, it does require that the expert demonstrate a scientifically valid basis for projecting the findings of a study identifying a different chemical-illness relationship to the proffered causal theory") (emphasis in original); *Schmaltz v. Norfolk & Western Ry. Co.,* 878 F.Supp. 1119, 1122 (N.D.Ill.1995) (evidence "fails to make clear why the incidence of eye irritation in rabbits exposed to high doses of atrazine could reasonably lead a doctor to conclude that an indirect exposure to atrazine could cause pulmonary or respiratory conditions in humans"); *Casey v. Ohio Med. Prods.,* 877 F.Supp. 1380, 1385 (N.D.Cal. 1995) (study showing link between halothane and cirrhosis not reliable scientific evidence of causal link between halothane and chronic active hepatitis).

### B. *Fit*

The second prong of *Daubert* requires that the proponent of expert testimony demonstrate that it "logically advances a material aspect of [her] case." 43 F.3d at 1315. Here, to prove causation against a defendant, plaintiff must prove that her injuries were caused or exacerbated by that defendant's products. In *Daubert on remand,* the court held that in order for expert testimony of causation to have "a valid scientific connection to the pertinent inquiry," *Daubert,* 509 U.S. at 592, 113 S.Ct. at 2796, under California law, it must demonstrate that exposure to the defendant's products "actually caused plaintiff's injuries" or, at least, that such exposure "more than doubled" plaintiff's risk of suffering those injuries. *Daubert on remand,* 43 F.3d at 1320–22. Otherwise, the expert testimony wouldn't "assist the trier of fact" in resolving the issue. Fed.R.Evid. 702.[17]

---

17. "California tort law requires plaintiffs to show not merely that Bendectin increased the likelihood of injury, but that it more likely than not caused *their* injuries. *See Jones v. Ortho Pharmaceutical Corp.,* 163 Cal.App.3d 396, 209 Cal.Rptr.

456 (1985). In terms of statistical proof, this means that plaintiffs must establish not just that their mothers' ingestion of Bendectin increased somewhat the likelihood of birth defects, but that it more than doubled it—only then can it be said

■ As in *Daubert on remand,* none of plaintiff's experts, whatever the reliability of their testimony, testified that either Boss or Drakkar Noir—or any other of defendants' fragrance products—actually caused her injuries or more than doubled her risk of suffering them. Thrasher testified that "to a reasonable scientific and toxicologic probability," fragrance products were "a substantial factor in causing [plaintiff's] current medical condition." Thrasher Decl. ¶¶ 21, 13.[18] Brautbar testified that plaintiff's injuries were caused "to a reasonable medical probability and certainty" by fragrance products. Brautbar Depo. 318/18–320/15. Perillo testified at first that exposure to formaldehyde and fragrance products "most likely" caused plaintiff's toxic encelopathy. Exh. 75 at 4, 8; Perillo Depo. 109/22–110/19. But he then recanted and admitted that he couldn't say what the cause of her injuries was. Perillo Depo. 268/6–269/11; 270/10–19. Heuser testified that exposure to fragrance products "significantly increased" plaintiff's chances of suffering her injuries. Heuser Depo. 206/17–208/23.

When pressed on the precise question, Brautbar, Heuser, and Perillo refused to say that exposure to fragrance products more than doubled plaintiff's chances of suffering her injuries. *See* Brautbar Depo. 318/18–320/2 ("I cannot answer with double … I really cannot calculate doubling or not doubling"); Heuser Depo. 206/25–207/18 ("I think there is no way of answering that really … I would be more comfortable by saying that it significantly increased it without saying whether it doubled, tripled or not quite doubled it … There is no way to give you a percentage"); Perillo Depo. 116/6–121/8 (hedging and finally refusing to give an opinion on this question).

Thrasher tried to quantify his opinion, saying that "reasonable scientific and toxicologic probability" means "51 percent or greater." Thrasher Depo. 237/6–16; 177/1–7. This would constitute a "connection to the pertinent inquiry," *Daubert,* 509 U.S. at 592, 113 S.Ct. at 2796, but it fails the requirement that the connection be "scientific," since, as the following exchange illustrates, Thrasher had absolutely no basis for picking the 51 percent number:

Q. How were you able to quantify it that way?

A. It's reasonable. That's all I can tell you. It's reasonable.

Q. Wouldn't 49 percent also be reasonable?

A. No.

Q. How did you get it to 51 percent?

A. Because it's a reasonable figure. It's above 50 percent.

Q. How did you get it above 50 percent?

A. Pardon?

Q. How did you get it above 50 percent?

A. It's a reasonable estimate on my part, a reasonable conclusion on my part. That's it.

Q. How did you calculate it to get above 50 percent?

A. That's a judgment call rather than a calculation call. It's like a medical opinion call, 51 percent. It's a scientific call at 51 percent.

Thrasher Depo. 237/6–238/9. Thrasher could not identify anything other than pure temporal coincidence to support his probability estimate, and based it upon what he knows about people with similar health problems, "not necessarily with fragrances but from other chemicals." *Id.* 177/8–16.[19] He also

that Bendectin is more likely than not the source of their injury." *Daubert on remand,* 43 F.3d at 1320 (emphasis in original).

18. Thrasher explained that there is no difference between a "scientific" probability and a "toxicologic" probability, and that he used both words because "I think it looks nice." Thrasher Depo. 238/10–14.

19. Temporal coincidence does not support legal causation. *See Hasler v. United States,* 718 F.2d

202, 205 (6th Cir.1983) ("Without more, [a] proximate temporal relationship will not support a finding of causation") (reversing district court's finding that swine flu inoculation caused plaintiff's injuries despite close temporal connection); *Schmaltz,* 878 F.Supp. at 1122 ("It is well-settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of [Rule] 702"); *Bradley,* 852 F.Supp. at 697 ("plaintiffs may not make out causation vis-a-vis MCS merely by reliance upon

admitted that there are no published statistics that would allow him to calculate or quantify the relative risk of any of plaintiff's injuries. *Id.* 158/20–159/12; 160/16–163/23. This is not a "scientific connection."

In *Daubert on remand,* the court held that there was no "fit" between the plaintiffs' experts and the issue of causation because the experts could not testify that Bendectin more than doubled their risk of having limb-reduction birth defects. The court found that the background rate of such birth defects was one per one thousand births, and held that "plaintiffs must show that among children of mothers who took Bendectin the incidence of such defects was more than two per thousand." 43 F.3d at 1320 (footnote omitted). "While plaintiffs' epidemiologists make vague assertions that there is a statistically significant relationship between Bendectin and birth defects, none states that the relative risk is greater than two. These studies thus would not be helpful, and indeed would only serve to confuse the jury, if offered to prove rather than refute causation. A relative risk of less than two may suggest teratogenicity, but it actually tends to *dis* prove legal causation, as it shows that Bendectin does not double the likelihood of birth defects." *Id.* at 1321 (emphasis in original).

Since Thrasher's probability estimate is not founded upon epidemiological studies showing a relative risk of greater than two, or some other evidence that would lend a scientific foundation to the assertion that fragrances more likely than not caused plaintiff's injuries, it does not constitute "a valid scientific connection to the pertinent inquiry" of causation. *Daubert,* 509 U.S. at 592, 113 S.Ct. at 2796. None of plaintiff's other experts even says that the relative risk is more than two, so their testimony, even if totally reliable, would actually tend to *dis*prove legal causation, just as in *Daubert on remand.*

C. *Other issues*

Plaintiff argues that because the Court prevented her from taking discovery about

the temporal congruity of [their exposures] and the onset of their symptoms"); *Cavallo,* 892 F.Supp. at 766 ("[a]t bottom, his opinion is founded primarily on the temporal connection between the spill and the development of Ms. Cavallo's symptoms...."). Plaintiff's position

the volatile organic compounds (VOCs) in fragrance products apart from aldehydes, she has been "precluded from determining what effect, if any, would result from the presence of alcohols, esters and ketones is [sic] said products. There appears to be no reasonable basis why the Court should allow discovery regarding aldehydes but bar discovery regarding alcohols, esters and ketones." Opp. to *Daubert* Mot. at 9 n. 2. In fact, as IFF points out, there is a very good reason: plaintiff repeatedly stated that her theory was that *aldehydes* caused her injuries, and she never argued about other VOCs. *E.g.,* 2/12/96 Tr. at 9/23–24 ("the ingredients that plaintiff's theory is focusing on are aldehydes"); *id.* at 9–12; Opp. to *Daubert* Mot. at 6 ("plaintiff's theory in this case is that her exposure to aldehydes contained in fragrance-scented products caused her symptoms and injuries").

Plaintiff argues that her experts did the best they could considering the limited amount of scientific information available regarding aldehydes and the injuries claimed by plaintiff. "These factors taken into consideration by Dr. Thrasher might not be appropriate if there was a body of scientific studies available to establish a threshold for exposure. However, the fact is that fragrance chemicals are not tested for neurotoxicity or other chronic effects." Opp. to *Daubert* Mot. at 11. There are two facets to plaintiff's argument based on this contention. The first is frivolous, and the second is simply wrong.

The frivolous one is as follows: "Where the lack of scientific evidence regarding the effects of a product is the result of the manufacturer's failure to test the products it puts into the stream of commerce, that manufacturer should be estopped from claiming that a plaintiff cannot establish causation, or that his experts lack a scientific basis for their opinions." *Id.* at 14. IFF correctly dismiss-

here is essentially the same as her argument in opposition to defendants' causation motion that the Court should employ a "common-sense" approach to causation rather than require scientific evidence.

es this argument with the following observation: "In other words, in plaintiff's view, a plaintiff should be excused from the burden of proving her theories of liability and causation if they are so bizarre that no one has ever attempted to test them. There is no authority whatsoever for this outlandish contention." IFF Reply on *Daubert* Mot. at 9 n. 4. The Court agrees completely.

Second, and more seriously, plaintiff relies on certain language from the Ninth Circuit's opinion in *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116 (9th Cir.1994), a breast implant case. In that case, the court affirmed the admission of the plaintiff's experts' testimony based on its finding that "Hopkins' experts based their opinions on the types of scientific data and utilized the types of scientific techniques relied upon by medical experts in making determinations regarding toxic causation where there is no solid body of epidemiological data to review." *Id.* at 1124. In *Hopkins*, the bases of the experts' opinions included studies done by Dow, "scientific knowledge of silicone's ability to cause immune disorders as established by animal studies and biophysical data," studies authored by one of the experts, and "preliminary epidemiological" studies. *Id.* at 1125.

Here, in contrast, there are no epidemiological studies, preliminary or otherwise. None of the experts did his own study on any of the issues in this case. There are only a couple of even marginally relevant animal studies, whose authors caution not to extrapolate for human purposes and which don't involve the specific injuries claimed by plaintiff. And there are no studies by IFF or any other defendant (hence plaintiff's estoppel argument). In *Hopkins*, the epidemiological data was not as extensive as the court would have liked, but some relevant data existed, and there were also other types of reliable scientific evidence. Here, there is neither a single epidemiological datum nor other reliable evidence. Plaintiff's reliance on *Hopkins* is thus unavailing.

The Court rejects defendants' request that the opinions of Brautbar, Heuser, and Perillo on the issue of causation be excluded because plaintiff did not designate them to testify as to causation. The Court agrees with plaintiff that, since defendants questioned all three quite thoroughly with respect to causation at their depositions, plaintiff's failure to designate them did not prejudice defendants.

■ However, the Court wishes to make clear that it agrees with defendants' argument that Perillo's opinion as to causation should be excluded for the additional reason that he is not qualified to testify as an expert on that issue. Perillo is not a medical doctor, a chemist, or a toxicologist, and he has no training in any of those disciplines. Plaintiff's concession that Perillo's opinion goes only to the last three prongs of the "Thrasher test" mitigates this problem, but to the extent that it may not eliminate it entirely, the Court holds that Perillo, as a neuropsychologist, is not a qualified expert on issues of toxic causation. *Summers v. Missouri Pacific R.R. System*, 897 F.Supp. 533, 540 (E.D.Okla.1995) (excluding neuropsychologist's testimony in MCS case because she was "not an expert in the field of medicine or toxicology").

D. *Multiple Chemical Sensitivity*

■ Defendants argue that, in addition to the reliability and fit problems afflicting plaintiff's experts' testimony more broadly, their opinions as to plaintiff's MCS should be excluded for the more particular reason that there is no reliable scientific evidence that such a disease exists and thus that their testimony about it cannot possibly be based on "scientific knowledge" under *Daubert*. As defendants point out, every recognized medical organization that has studied this alleged condition has concluded that MCS has not been demonstrated to constitute a physiological, as opposed to purely psychological, illness. These distinguished bodies include the American College of Occupational and Environmental Medicine (1991, 1993), the American Medical Association (1992), the American College of Physicians (1989), the American Academy of Allergy and Immunology (1986), and the California Medical Association (1986). *See* Exh. B–G to Kroft Decl.

The Court's research has revealed that every court to rule on this issue has agreed with defendants' argument. In *Bradley v.*

*Brown,* 852 F.Supp. 690, 700 (N.D.Ind.1994), *aff'd,* 42 F.3d 434 (7th Cir.1994), the court reviewed the evidence submitted on MCS and concluded that "[t]he 'science' of MCS's etiology has not progressed from the plausible, that is, the hypothetical, to knowledge capable of assisting a fact-finder, jury or judge." In *Summers v. Missouri Pacific R.R. System,* 897 F.Supp. 533, 538 (E.D.Okla. 1995), after a lengthy discussion of the medical authorities, many of which defendants submitted in this case, the court adopted the *Bradley* court's conclusion quoted above.

In *Carlin v. RFE Indus., Inc.,* 1995 WL 760739 (N.D.N.Y.), the court held that the plaintiff's experts' testimony was inadmissible under *Daubert* and also concluded that "[e]ven if the validity of plaintiff's proffered expert testimony were to be assumed, the court has serious doubts as to the scientific validity of the multiple chemical sensitivities syndrome." *Id.* at *4. The court discussed the evidence submitted by the parties regarding MCS, and concluded by agreeing with the courts in *Summers* and *Bradley* that MCS was not a scientifically valid diagnosis. "The materials submitted by the plaintiffs, although showing continuing experimentation on the concept of multiple chemical sensitivity, do not lend credence to their assertion that multiple chemical sensitivity is a scientifically established syndrome or disease. Plaintiffs' own evidence suggests just the opposite." *Id.* at *7.

In three other cases, courts indicated some skepticism as to whether MCS was a valid medical condition, but did not need to reach the issue. *See La–Z–Boy Chair Co. v. Reed,* 936 F.2d 573 (Table), 1991 WL 114775, *1–2 (6th Cir.) (affirming district court's refusal to rely on clinical ecologist's testimony regarding MCS); *Cavallo,* 892 F.Supp. at 767–68 (discussing controversial nature of MCS); *Patrick v. Southern Co. Services,* 910 F.Supp. 566, 570 (N.D.Ala.1996).

Significantly, the Court has discovered no case in which MCS was recognized as a legitimate medical condition. While the vintage of some of the evidence submitted by defendants casts some doubt on its probative value, plaintiff has not countered with any persuasive evidence at all. The Court believes that, given present knowledge, *Bradley* and *Summers* correctly determined that MCS does not represent the reliable "scientific knowledge" which *Daubert* and Fed. R.Evid. 702 require. For now at least, MCS remains a "[s]cientific controvers[y]" which "must be settled by the methods of science rather than by the methods of litigation." *Underwager v. Salter,* 22 F.3d 730, 736 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 351, 130 L.Ed.2d 306 (1994). This constitutes an alternative ground for excluding that part of plaintiff's experts' testimony concerning plaintiff's purported MCS.

## CONCLUSION

### A. *Causation*

This case calls to mind the conclusion of the court of appeal in *Setliff* in denying the plaintiff's attempt to force the defendants to disprove causation: "Plaintiff's vague allegations that VOCs in paint products caused his injury is an attempt to put an industry on trial based on the conviction that since he is injured, it must be their fault." *Setliff,* 38 Cal.Rptr.2d at 769 (citation omitted); *accord Mullen,* 246 Cal.Rptr. at 37 ("Because asbestos is not a product, but rather a generic name for a family of minerals employed in a myriad of uses, the unavoidable conclusion is that plaintiffs are attacking an entire industry, not seeking recovery for damages caused by a single fungible product carrying with it a singular risk factor") (internal citations omitted).

If one substitutes "aldehydes in fragrance products" for "VOCs in paint products," one captures the instant case. But the mere fact that a person is injured, without more, constitutes no basis for holding another person liable for that injury. Rather, a plaintiff must link a defendant to her injuries; otherwise, liability is pure insurance, divorced from any notion of responsibility, much less fault, and imposed in spite of the lack of any agreement to insure. The California courts have made it clear that the most tenuous link permitted is the manufacture by a defendant of a product also manufactured by others, where the defendants collectively account for a substantial share of the market for that

product, and that product injured the plaintiff.

Putting an industry on trial is different than putting on trial a product which happens to have been manufactured by several companies from an identical formula. Courts are ill-equipped to conduct trials of entire industries, and individual plaintiffs in a private action have no right to put entire industries on trial. Private cases and controversies must sweep more narrowly, catching within the litigation net only those persons whom the plaintiff can link to the harm that has befallen her. That application of these principles may leave an injured person without a remedy in tort is no objection, because the tort system is not designed to provide compensation for every injury. Therefore, while the Court is not unsympathetic to plaintiff's injuries, which while not threatening her life have undoubtedly altered her lifestyle, the mere fact (if it be a fact) that plaintiff has been injured by fragrance products is not a basis for holding any particular fragrance product manufacturer responsible.

In this case, plaintiff has presented no expert testimony from which a jury could find that any of defendants' products was a substantial factor in injuring her. Because her experts were utterly unable to tie her injuries to any particular exposure or product, plaintiff's claim that her injuries were caused by her 22 to 32 exposures to IFF's products, rather than her 16,000 exposures to other companies' products, is pure speculation, "mere possibility" rather than a "reasonable medical probability."

Plaintiff suggests that a jury could simply use its "common-sense" to infer from her exposures and their temporal relationship to her symptoms that she was injured by defendants' products. This ignores the requirement that causation be proved by expert testimony where, as here, the etiology of plaintiff's injuries and the alleged mechanisms of causation are beyond the experience of laypeople. It also ignores her experts' testimony and her own admission that not every subjective experience of a symptom following exposure to a fragrance product constitutes or reflects an injury.

Finally, plaintiff's attempt, based on "fairness" rather than doctrine, to shift to defendants the burden of disproving causation is unavailing. The California precedent that *Erie* requires this Court to apply restricts *Summers* and *Sindell* burden-shifting to narrowly circumscribed circumstances not present here. Specifically, plaintiff has not sued all potential tortfeasors, so *Summers* is inapplicable; and defendants' products are not fungible, so *Sindell* is inapplicable. In addition to the failure of the prerequisite of fungibility, plaintiff makes no attempt in her papers to show that she has sued a substantial share of the market for fragrance products.

Unfortunately for plaintiff, this is a case that falls through the cracks between traditional, direct causation and burden-shifting causation. Because plaintiff has not presented evidence establishing a genuine issue of fact as to her ability to prove that any of defendants' products injured her, the Court GRANTS defendants' motion for summary judgment on the issue of causation.

### B. *Daubert*

Plaintiff asks, "Given the dearth of research on the neurotoxic effects of fragrances and fragrance chemicals, what is a plaintiff to do?" Opp. to *Daubert* Mot. at 13. Unfortunately for plaintiff, the answer is: Wait. When a plaintiff can't prove her case with reliable scientific evidence, she can't prove her case. This is as true when her inability is due to science's laggardly pace in researching a legitimate problem as it is when the inability is due to the fact that her theory is "so bizarre" that no one has bothered to test it. *See Underwager*, 22 F.3d at 736 ("Scientific controversies must be settled by the methods of science rather than by the methods of litigation").

While keeping doubtful science out of the law "on occasion will prevent the [fact-finder] from learning of authentic insights and innovations," *Daubert*, 509 U.S. at 597, 113 S.Ct. at 2798, and will thus sometimes prevent a plaintiff with a meritorious claim from prevailing thereon, the rule reflects the balance struck between the needs of science—"broad and wide-ranging consideration of a multitude of hypotheses"—and the needs of law—

certainty, efficiency, and finality, *id.*, and, the Court would add, social legitimacy. Given the difficulties in legal resolution of scientific controversies, *see, e.g., Daubert on remand,* 43 F.3d at 1315–16, and the great benefit to society in scientific resolution of scientific controversies—meaning in the progressive and continuous rejection, refinement, and confirmation of hypotheses—the Court cannot avoid thinking that the framers of Rule 702 did well to make law a prisoner to science, not the other way around. *See Underwager,* 22 F.3d at 736 ("More papers, more discussion, better data, and more satisfactory models—not larger awards of damages—mark the path toward superior understanding of the world around us").

Plaintiff's experts' testimony that aldehydes in fragrance products caused plaintiff's injuries is utterly lacking in the "objective, independent validation" required by *Daubert.* None of them has conducted any research on the ability of aldehydes in fragrance products to cause the injuries of which plaintiff complains. None based his opinion on published research by other reputable scientists on the ability of aldehydes in fragrance products to cause the injuries of which plaintiff complains, apparently because no such research exists. None based his opinion on any other objective sources such as learned treatises or statements of professional associations. Rather, Thrasher based his opinion that aldehydes in fragrance products caused plaintiff's MCS, toxic encelopathy, small airways disease, and dysosmia on the fact that aldehydes are known to irritate the skin, amplified by his assumption that, since the skin is more resistant to irritation than the respiratory tract, it stands to reason that aldehydes would irritate the respiratory tract as well.

But while this assumption may have an air of plausibility about it, plausible hypotheses are not "scientific knowledge," *Daubert on remand,* 43 F.3d at 1315, but the building blocks and catalysts of such knowledge. Without evidence that "(at least) a recognized minority of scientists" in his field, *id.* at 1319, accept his methodology of inferring aldehydes' ability to cause the injuries of which plaintiff complains from their ability to irritate the skin, Thrasher's opinion as to causation is based on nothing more than

"subjective belief and unsupported speculation." *Claar,* 29 F.3d at 502. Plaintiff has not presented evidence that even one other scientist believes Thrasher's approach to be "the scientific method." *Daubert on remand,* 43 F.3d at 1319.

The conclusion of the *Cavallo* court is on-point here as well. In that case, the court excluded an expert's testimony because "[a]t bottom, his opinion is founded primarily on the temporal connection between the spill and the development of Ms. Cavallo's symptoms, as well as on his subjective, unverified, belief that AvJet can cause the types of injuries from which Ms. Cavallo suffers. This is not the method of science." 892 F.Supp. at 773 (footnote and citation omitted).

Moreover, plaintiff's experts' testimony does not provide a "valid scientific connection to the pertinent inquiry" of causation. *Id.* at 1320. Brautbar, Heuser, and Perillo could not opine that plaintiff's exposure to defendants' fragrance products either "actually caused plaintiff's injuries" or "more than doubled" her risk of suffering them, so their testimony cannot support a finding of legal causation. *Id.* at 1320–22. While Thrasher's opinion that such exposure was more likely than not the cause of her injuries has a "connection to the pertinent inquiry," it lacks a "valid scientific connection," because of his complete inability to provide scientific substantiation for his estimation of the probability of such a causal connection at 51 percent.

The Court therefore holds that plaintiff's experts' testimony on the issue of causation is inadmissible under *Daubert* both because plaintiff has failed to show that such testimony is reliable and because she has failed to show that it "fits" the issue of causation. Accordingly, the Court GRANTS defendants' motion to exclude such testimony. Absent her experts' testimony, plaintiff has no evidence of causation at all, and thus cannot withstand summary judgment on that issue. The Court's grant of defendants' *Daubert* motion thus constitutes an alternative ground for summary judgment on the issue of causation.

In addition, the Court holds that plaintiff has failed to demonstrate that multiple chemical sensitivity is "good science." *Id.* at 1315.

Because plaintiff's experts' testimony regarding MCS is thus inadmissible, plaintiff cannot withstand summary judgment on the issue of causation of her purported MCS, so this holding constitutes an alternative ground for partial summary adjudication on the issue of causation.

Finally, the Court holds that, apart from the inadmissibility of plaintiff's experts' testimony for the reasons already stated, Perillo's testimony on the issue of causation must be excluded for the additional reason that he does not qualify as an expert on questions of toxic causation.

### C. *Summary Judgment*

For the foregoing reasons, the Court hereby GRANTS summary judgment in favor of defendants and against plaintiff on both of her causes of action. Defendants IFF, Parfums Guy Laroche, Coty, Inc., the Body Shop, Inc., Cosmair, Inc., Lancaster Group, and Calvin Klein Cosmetics[20] joined in defendants' motion for summary judgment on the issue of causation, but three defendants listed in the caption did not participate in the motion: Parfums Joop! Paris, Parfums Davidoff, and Eurocos Frankfurt/Main. Based on earlier proceedings in this case, the Court believes that one or more of these three defendants may not exist or be properly named, and in any event, in light of the conclusions expressed in this Order, the Court does not believe plaintiff can sustain her burden of proving causation as to those three defendants, either.

Plaintiff is hereby ORDERED to file a paper of not more than ten pages no later than July 29, 1996 informing the Court of the status of her claims against Parfums Joop! Paris, Parfums Davidoff, and Eurocos Frankfurt/Main and stating whether (and if so, how) she intends to pursue them. Such paper shall not in any manner reargue any matter resolved by this Order.

IT IS SO ORDERED.

---

20. Pursuant to the Court's Order filed May 28, 1996, defendant Calvin Klein's separate motion for summary judgment on the basis of the statute of limitations (concerning California's Doe pleading rules) is denied as moot.